Good morning, your honors. My name is William B. Fetterman, Fetterman and Sherwood, co-lead counsel for the plaintiffs. This is an appeal from a decision dismissing a securities class action. It is a de novo review of Judge Herman's acknowledged close question of law and facts, where the district court found that defendants had made material misrepresentations, but the court still dismissed the complaint. It's very unusual for this type of case to have the strength of the confidential witnesses that we had, and the court found material misrepresentations. So you're saying, Mr. Fetterman, why are we here? Where did the wheels come off the bus? Well, it came off the bus when the court deviated from the prior precedent of this court. The court found that there had to be some type of motive evidence, which we did demonstrate at the pleading stage. And the motive evidence here is that the CEO, John Terwilliger, margined his entire stock. Now, under the Lorman v. U.S. Unwired decision for Scienter, we've met the standards for Scienter. This is a new standard that Judge Herman is trying to impose for this motive to defraud. If you look at this court's decision in MCI, which defendants demote to merely a footnote, this court found motive evidence can be the pledge of securities. In MCI it was Bernie Eberstock. Here it's Terwilliger's stock. In addition to that, this court, the district court, failed to recognize or address that one of their directors, Lee Tawes, T-A-W-E-S, the investment banker on the board, sold $2 million of stock mere weeks before the fraud was disclosed. And I keep saying fraud because the court found there to be actionable fraud and several instances of it. Completely unexplained, we have one of the board members selling his stock. He had never sold stock before, immediately before the negative announcement was made. The court didn't address that, and in and of itself, that's motive evidence. In and of itself, the margin of stock by Terwilliger is motive evidence. He recouped millions of dollars, and eventually he lost millions of dollars of his stock in a margin call. Now, the second part of the motive here, we believe, has to do with the judge's belief that by investing $5 million of corporate money at the very tail end of the securities, somehow cures the fraud that took place two to three years earlier. Remember, the class period starts in November of 2009, when the defendants flat out lied to the public. And the strength of the confidential witnesses here is outstanding. The confidential witnesses are the technical, scientific people who are in the drilling meetings, reviewing the same documents as these individual defendants were. The same information, and they concluded, and we have in our complaint the statements, there never were reserves of one to four billion barrels. Never, never occurred. In addition to that, these defendants never conducted the drilling that was required to come up with that statement. Doesn't the statement say estimated reserves? How do you deal with that? Because to even use the word reserves, it is a scientific term in the industry and used by the SEC under the PRMS. You cannot say you have reserves unless you've tested the wells. There were no tests on these wells, and that's what the confidential witness number one goes to. So there were no tests about Tamandua, how do you say that, number one, when the statements about reserves were made? There have been no tests? I'm sorry? What had the test shown about Tamandua number one when the statements about reserves were made? That occurred later after the fact. That was not part of particularly the November 9, 2009 statement where they specifically said that estimated recoverable reserves of one to four billion barrels. That in and of itself is a false statement, and if it's not a lie, it's certainly severe and reckless, and it's reckless because they had not done the testing to come up with that statement, and that's what the confidential witnesses said. Okay. The second part has to do with this $5 million, and why would they invest $5 million? There's a long body of authority on that, and there's several very good law review articles from the University of Pennsylvania, Cornell, Loyola, and the University of Illinois from Langevoort, Arlen, and Williams, and Carney, and I have the sites here, and specifically they summarize data showing that a small company at the end of its life oftentimes will commit the remaining resources it has in what we call the Hail Mary. Why not spend the money and see what happens? It's not their individual money. It's what's remaining in the corporation, and it was inadequate to keep this company going anyway, and you take that into conjunction with the background of these individual defendants as well as the board members who are defendants, which we specifically state through the sleuth.com article, this was not a mistake, and we're at the pleading stage where all allegations are taken as true, and specifically this court has found that when it's a tie, the tie goes in favor of the plaintiffs. That's not what happened here. How many principals were in this company? There were three employees. There were two principals. That's it in this company. There was then a seven-member management committee of the drilling. Two of the seven members were the CEO and the CFO of this company, and those were the defendants we've named here, Your Honor, and that's Jay Jacobs, the CFO, and John Terwilliger. Now, what was their stock ownership in the company? John Terwilliger owned 27.5%. And the other guy? He had a much smaller position, Your Honor. But then you had Taws, T-A-W-E-S, the investment banker who sold the $2 million at the tail end. He owned almost 10%. So they had a vested interest in pumping this stock up, keeping it high. One had a huge pledge on his securities, which wound up getting called when the stock fell, and that's what goes straight into the MCI decision, where this court specifically found motive evidence could be that pledge of securities. And there are other courts that say the same thing. Here he pledged it, and he wound up losing it when the stock fell. Taws got to liquidate $2 million. So do you concede that the motive evidence has to be part of the formula? I thought part of your argument was just that when there's this type of evidence of direct knowledge of falsity, you don't even have to establish motive. I don't think you do at all. That is a much higher standard, and that's where this court, the district court's decision, diverges from the body of law from both the Fifth Circuit and the district courts. We have a finding of specific fraud. It was either recklessness or, more exactly here, they knew what they were saying was fraudulent at the time they said it. If you look at these individual defendants, these are experienced oil men. If you look at their backgrounds, they all have failed small companies that had to do with investor money. They knew they were misleading the market at the time they said it, and that's what the court found as it said it's a close decision. But it's still a motion to dismiss, not a motion for summary judgment. We have specific allegations here that support motive by a minimum of two of the defendants, and we have the opportunity as well. It's not a criminal case. We're still in a civil court proceeding here, and it should not be an insurmountable hurdle we get over. Granted, it's a higher hurdle, but what more can we have than people who are industry knowledgeable, the geologists, the geophysicists who came forward as confidential witnesses to say the statements made by this company were fraudulent at the time they were made, and they were fraudulent because their information was either wrong or we did not have the information necessary upon which to make an opinion of the $1 to $4 billion in reserves. The subsequent principles, technical people, geologists or engineers? Yes. The CEO had over 30 years of experience in the business. The CFO had his master's degree as well as his undergraduate degree. He was a CPA, well experienced in the oil and gas business. Is he the guy that did the SEC report? Yes, and he also signed the 8K filings, the 10K and the 10Qs. The individual defendants here signed the filings with the SEC, and the standard of reserves versus the reservoir is an SEC standard. And we have a CPA as the CFO who knew what they were saying was not accurate or it was reckless, severely reckless when made. There's no question about that. That was the finding by the court. And that's what's staggering here, that even though holding it's a close decision, we get dismissed. And I would urge the court to look at the complaint, and it was only the consolidated complaint that was filed. We never had an opportunity to file an amended complaint, and the court is wrong about that in her findings. There was an initial complaint and the consolidated complaint. We never had an opportunity to respond to the motion to dismiss with an additional pleading or this court's order. But you don't think you need another complaint, right? No, I don't. I think the complaint as drafted is good, but we can address the court's concern, particularly on loss causation, where we had a series of drops, and we can demonstrate and said, and we could beef it up even more, that there was a drop in price on each of those occasions with each of the small disclosures. So we can fill that in. What is the cleanest way that you seek relief from us? What is the cleanest way? You've got several alternative things here. What we're seeking is a reversal. We'll remand this case to district court and allow this case to proceed. That would be our primary request and allow us to get discovery. And we would articulate what standard would we articulate and on what grounds? The standard here is the court found there to be an actionable material misrepresentation. In and of itself, that is a finding of scienter. And if for some reason that is not sufficient, the court's finding of a lack of motive by these defendants was erroneous. And it's contrary to this court's finding in the MCI dealing with Bernie Evers, where the court specifically said it was sufficient to show the pledge of securities as motive evidence. That was this court's holding, and it's the correct one that's been followed by other decisions. The most recent decision by the Ninth Circuit, Reese v. Malone, also shows that the standard for scienter is not as high. You either look at the specific allegations, which create a strong inference, and that's what we have through the CWs. And if that's not sufficient, you do a holistic approach. If you put this entire complaint together and you look at the background of the individual defendants, including the board members, as alleged, these people are bad characters. They knew what they were doing. They manipulated the stock. They pumped it up. This investment banker on the board who is specifically experienced in oil and gas, as are all the board members here, sold $2 million immediately before the price falls, and he had no prior sales whatsoever starting 2009, 2010, 2011, or early 2012. The Supreme Court is about to decide the Halliburton case out of this circuit. I know that's a class certification question. You're not at that stage in this case, but is it possible that decision could impact even this loss causation analysis at a non-class search stage? That's an interesting question. Defense counsel and I were just discussing it, and we know there are a number of cases where particularly defendants have filed a motion to stay pending the determination under Halliburton. It is possible that Halliburton will have an effect on this case. The Halliburton decision, however, is not on a motion to dismiss. It is well beyond, and Halliburton, as we all know, the court did pass the complaint. There was more than one consolidated complaint filed. Here, if necessary, we can file additional complaints to address the court's concern. We never had an opportunity to do that, and I think that's a bad precedent for this court to endorse. It's already a high enough standard that we need to meet. With that high standard, the plaintiff, the investor, should have the opportunity to address the deficiencies by the court. This is not a situation where we've tried two or three amended complaints. We have never filed an amended complaint. And here, we have shown fraud. They misrepresented facts. That's unquestionable through our CWs. We have technical people in the company, technical CWs sitting at the same meeting reviewing the same information. The CWs say the statements made by this company were fraudulent and known to be wrong at the time made. Did you file something with the district court asking for reconsideration just on this issue that you claim that she got the facts wrong on whether you had a chance to replead? Because if it's clearly erroneous, as you said, that seems to me the type of thing you can ask the district court to correct. No, we did not. The district court prepared, I think it was an 86-page order, six of which were the actual decision. And the court's conclusion on the facts is simply erroneous under the law. She understood the facts or had the facts in front of her. I meant on the procedural issue. I know your time's up, but you said that she said you had a chance to replead and you said you didn't. I mean, that is the type of thing I think you could have brought to her attention, that that procedural aspect was wrong and you hadn't replead. From the record itself, you could see the filing. There was an original complaint and a consolidated complaint. We had never sought leave to amend, and we also never filed an amended complaint. So we never had an opportunity to address the court's determination. I have the citations to the law review articles that go to this letter. You could file a 28-J letter, would you, and furnish a copy to opposing counsel? Okay, we could do it at that time, and I will provide opposing counsel with a list of the five law reviews now. Thank you. Okay. Thank you, sir. You have some time left. And Mr. Peck. Starting with a reset of where we are on this, and talking first about the November presentation, if you look at that presentation, it is a 38-page presentation, and on page 11, I'm sorry, page 12 is the statement in the third bullet point that it's that issue here, and the issue here is one word. It's the use of the word reserves. That's what this case is about on the November presentation. Do you agree the word reserves has a precise meaning within the industry? It does not have a precise meaning within the industry in the context of this presentation. Was there anything in the slide presentation to warn investors that the term reserves is being used in another way other than the way that the industry normally uses the word? Yes. What was that? In the forward-looking statements on page number one, in the bottom paragraph, it expressly states that these are not SEC reserves, and that they have substantially less certainty than SEC reserves have. That's part of the presentation. What definition of reserves is forward-looking? The entire definition of reserves is forward-looking, because if you look at the statement on page number 12, it's talking about not wells drilled. There is no mention in here of any wells being drilled. There's no mention in any queues, caves, press releases. This is talking about leads and prospects, leads and prospects, and the picture of the leads and prospects is in this presentation. On page number 23. So you can see the leads and prospects. Those are not wells drilled. How is this synthesized with Lorman's requirement that the forward-looking statement be accompanied by cautionary language, and what specific concrete explanations of the risk were provided? Throughout here, there is cautionary language. Investors are told that the wells have not been drilled, and, in fact, what they're told, if you look at both the plan, which on the block overview plan, on the plan at the bottom, it talks about phase one. Phase one kicks in in June of 2009, and you're going to first reprocess the seismic that you currently have, the 2D seismic. Then you're going to shoot additional seismic. Then you're going to drill wells in the future, and then if you look at the budget that occurs on page number 34, you see in the budget that you've got 3D seismic in the budget. Then you have two well preps in 2010, no wells drilled, and you're not going to drill wells until 2011. What specific concrete explanations of the risk are there? If you were to tell me where you think it's the best specific concrete explanation of the risk, where is that? It is this document incorporates by reference in the forward-looking statement. It incorporates by reference all of the 10K, the prior 10K risk statements, and in those 10K risk statements, those risk factors, it expressly states unequivocally that until a well is drilled and tested, we do not know what the hydrocarbons are on that concession. That wasn't part of the slide presentation. It is. It's incorporated by reference. But is the underlying document then in there? The underlying document is publicly available to everyone, all of the investors. It's the 10K. It's the annual report that everyone has access to and can look at. There was some history. SK, who was apparently some kind of partner of sorts with the principals here, had been active in that area. So somebody knowledgeable about this area could conclude that when you use the unqualified word, estimated recoverable reserves, you had some information from SK that you didn't say possible reserves. It said estimated recoverable reserves. But it says leads and prospects. Oh, I understand. But, you know, somebody knowledgeable in the industry could think, well, they must have something from SK here that gives them more confidence than I'm seeing in estimated recoverable reserves when you don't say possible or even probable in front of it. You know, I don't believe that's likely here at all because of this. If you look at what happened when the Tamandu was drilled, there are press releases about the Tamandu. There's press releases about the wells being drilled. Wells aren't drilled in secret. If there had been wells drilled, people would have known about the fact that wells were drilled. You would have told about the wells drilled in the presentation. It's not a mention of a well being drilled in the presentation. You're talking about leads and prospects. No one is misled. If somebody was misled about this, if somebody really believed there was a billion barrels of reserves, the stock price would have gone through the roof. Just think about it. There's 30 million shares outstanding for Houston American. Take, you know, 37.5 percent of the concession times what do you want? You use 10 bucks a barrel, 20 bucks a barrel. The stock price wouldn't have been at $4. It went down on the date of the announcement and only moved slightly the next day. Nobody was believing that there was that kind of reserves here because that's not what this play was about. What this play was about is let's get in before any wells are drilled, and we know it's a high-risk but potentially high-reward situation. We're going to get in before any wells are drilled. And I want to go back. Where did that billion barrels come from? I mean, that also lends confidence to the fact that these guys must know something that we don't know. It comes from the presentation. If you take the leads and prospects on the 3-D picture here and you determine the acre feet of those leads and prospects, and then you take what is in the other drilling areas around the concession, all of which is described right here in the presentation on what is done around that concession, and you multiply that by an average barrels per acre foot, you get a range of numbers. You get a range of numbers. And so no one is being misled into believing that there is wells drilled and tested, which is the premise on which they say there was falsity. And here you have to have not only falsity, but you have to have a strong inference of Sienter, a cogent and compelling inference of Sienter. And, Judge Davis, I think you really latched onto it. You've got Mr. Terwilliger owning 27 percent of this company, 30 million shares outstanding, 27 percent. Let's say about eight million shares. Before the November announcement, that stock was trading about four bucks a share, four bucks a share. He then does not trade at all during the class period, and I'll get to the question about pledging his stock in a minute, does not trade at all in the class period. The stock price drops on the announcement of the Tamandua, and he is margin called, as is Mr. Tawes, margin called at well below the four bucks. What kind of fraud scheme is that? Is that all in the complaint, or where are you getting that from at the Rule 12 stage that we can consider? Pardon me? Where are you getting that information from? That information is in the record about what the sales were and allegations in the complaint. So what you have here is you don't have a fraud when somebody is investing. They invested $50 million in the Tamandua Wealth. This company owns 37.5 percent of the 50 million bucks that's invested. Then they put in another five million into the testing of their own money in a company in which Mr. Terwilliger owns 27 percent of the company. Every dollar that's invested, one dollar is his. He's fully aligned with the shareholders. He doesn't have a reason to defraud the shareholders. If he's defrauding the shareholders, it only hurts him because he is the largest by far shareholder in the company. So there cannot be a strong inference of fraud here. And I want to get to the issue about the shows and the Tamandua unless the Court has any questions about the November presentation, any more questions about the November presentation. Okay. And this Court has said repeatedly, lack of insider sales undermines completely the plaintiff's case. And that was in Nathan v. Sonagen, and there were no insider sales there. Mr. Taw's sales did not occur until after the announcement about the failure of the Tamandua Wealth, and the stock price dropped, and he was margin called out. So on the shows, they've got one witness who was actually there. What was the representation? Strong inflow of hydrocarbons? Strong shows or strong inflow of hydrocarbons. So what happened is they're drilling the well. There's a kick. They believe it's a strong inflow of hydrocarbons. CW3 is not disputing that there was a show. The debate is over whether it was strong, as some people believe, or whether it was not strong. That is not fraud. A debate over whether some people think it's strong or not strong does not make out fraud. That's the other allegation that they have is over this. There were no shows of flowable hydrocarbons, not that they were strong or medium or, you know, it's that they say no. No, well, CW. No shows of flowable hydrocarbons. CW3 in paragraph 104 says no strong shows of hydrocarbons in paragraph 104. He's not disputing that there were shows. He's disputing that the shows were strong. And I'm looking at amended complaint paragraph 104. What does inflow mean in the industry? It's just that all it is is an indication of hydrocarbon. It doesn't mean that there is commercially producible hydrocarbon. In fact, they said if you look at what's happening in those releases, they are measured and they are balanced. They're trying to tell what they have on the well, but they're also telling the negatives. They're saying that the well is having problems in terms of the drilling. They say that there is no assurance that we will locate hydrocarbons in sufficient quantities to be commercially viable. And they're saying it is not easy to verify. In that same paragraph where they talk about the strong show, they say it is not easy to verify the quality and quantity of hydrocarbons in the formation due to the lack of porosity data. So they're saying we can't tell you what the quantity is of hydrocarbons because porosity is affecting us. But we believe as we're drilling the well, there's a kick. Nobody debates that there was a strong kick. That's not subject to debate here. I mean, none of the CWs say there wasn't a kick. What happened is— Cross-appeal this. Pardon me? Cross-appeal this. I mean, this is a question about whether or not there was any falsity in connection with the statement and whether or not there was a strong inference of scienter, particularized facts showing a strong inference of scienter, which the plaintiffs have to have, particularized facts showing that somebody intentionally was trying to misrepresent something by saying strong shows. The fact that they used an adjective, strong, when everybody says there's a show and people disagree about whether it's a strong show or not a strong show does not create a fraud. And, again, especially in a context like this where the people who are supposedly fraudsters are the ones who are losing all the money here. It's been a while since I looked at those statements. None of the statements deny that there was some showing. CW3 in paragraph 104, the only witness who was around at the time, the others were hired after the testing. So what happened is they drilled the well. They had the kick of hydrocarbon, or at least they believe they did. And then a period of time later, in February of the next year, they did testing on the well. But those tests did not show hydrocarbons. And so all of the other CWs are looking at the test results, which were not available at the time of the disclosures. They didn't have them at the time of the disclosures. And so they're coming up with different views based on test results. The only one that was there, CW3 in paragraph 104, does not dispute that there was a hydrocarbon kick. He does not dispute that there was a show. He just said it was not a strong show. And so that's the debate. And this was all measured and balanced in terms of the good news that you had and also the negatives. You read the press releases. They've got the negatives in there about the wells. The next problem they've got with their case is they've not established loss causation. Loss causation, a critically important concept here in being able to plead a securities fraud case. Can you say that the district court erred in requiring a heightened pleading standard for loss causation? No, no. Foreman doesn't require a heightened pleading standard for this element, does it? What this court has required and what the Supreme Court has required is that there be a corrective disclosure that corrects something that was said earlier and demonstrates the falsity of that. So if you're going to have a—and that results in a decline in the stock price. So take their show claim, for instance. They say that you said there were strong shows. Well, there's no corrective disclosure that came out that talked about shows at all. There's no—that showed the falsity of that statement. And if you don't have a corrective disclosure that shows the falsity of that statement, then you don't have causation. You don't have loss causation. What about the disclosure that the well was being abandoned? The fact that the well is being abandoned doesn't show that there was a show or not a show. It doesn't tell you anything about a show. It was an unsuccessful well, and if you read the disclosure as saying that there's promise here, I'd say that's negative news, that the show didn't work out. Well, the fact that there's negative news about the company is not sufficient. There has to be negative news about the fact of whether there's a show. You can have a lot of shows in a well and still not have a commercially viable well. So the fact that a well is abandoned tells you nothing about the shows. And the shows, by the way, tell you nothing about whether the company is—it's going to be commercially viable. It tells you nothing about that. So—and, in fact, the company says that. We're not claiming here that there's any hydrocarbons in commercial quantities here, and we've disclosed that. So— What about disclosing the SEC investigation? Well, that can never be the case, that the fact that somebody is investigating constitutes a corrective statement because an investigation is just an investigation. To be sure, the stock price can drop on an investigation because shareholders are thinking about what risks might occur in the future. But a SEC investigation cannot be, in and of itself, revealing that anything that was said before was false or fraudulent. It just cannot be. You just can't have the government investigating people and saying, well, that means just because we're investigating that somebody's done something wrong. So an SEC investigation cannot be. You're talking about causation, and it's going to have an effect on the market, like you said, if people know the SEC is investigating. Exactly. Exactly right. And so the fact that— I still don't understand. Go ahead and finish your answer for Judge Costa's question, please. Yeah, that's exactly right. I mean, it's going to have an effect on the stock price, and the stock price did drop, but it's not because of lost causation. It's not because of something, a corrective statement about the shows. It's an announcement about the SEC, which has no bearing on it. The market's going to think that the SEC is investigating because there was a problem with the prior disclosures about these wells. I mean, this isn't some massive company that has a hundred things going on. We know that the whole focus on the company at this time was these wells in Columbia, right? Well, it's got wells in Columbia, but not just on this concession, but it's got wells on other concessions. But there's a case out there that was recently decided by the Eleventh Circuit on this very issue. It's called Meyer v. Green, 710 F. 3rd, 1189, at page 1201. It says exactly what I just said about the SEC cannot be the basis for a corrective statement. I'm really perplexed about your answer to my question about the district court standard that it used when it said that they failed to address whether the alleged misstatements or omissions were the actual cause of the economic loss as opposed to other explanations. They don't have to address that because they're not authorized or required to determine—the court is not—whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences. The district court required them to say that it was the actual cause, and that is the wrong standard. And so I thought that you would agree with that at least at the very start, and we could start from, well, even under the correct standard, they haven't met. I thought that was going to be your argument. I didn't realize you were going to say that that's the correct standard. Well, the fact of the matter is there has to be a—whatever the standard is, there has to be a corrective statement. If you concur that the standard is that the plaintiff can plausibly infer loss causation and they do not have to show that it is more plausible than other competing inferences, do you concur that that's the correct standard? They just have to plausibly show—plead something that shows the loss causation, but they don't have to say that it's more plausible than other explanations. They have to plead particularized facts showing that— You do not have to plead particularized on the loss causation under our precedent, do you? I believe that you have to show a corrective disclosure and you have to show CNR in connection with that corrective disclosure. But there is no particularity requirement under the statute with regard to loss causation. There is particularity in the sense that you have to show that there is a statement that corrects something that you said earlier. You say some reason, but you don't have to say that it's the best or that you know it's the best. You have to say something that corrects something that you said earlier. It has to be corrective. It's not enough just to say you infer it's corrective. It has to be actually corrective of something that you said earlier. That's the trouble I'm having. It's got to correct something. It can't be an inference or speculation about correcting. It actually has to correct for there to be loss causation. And I've got five seconds. Any other questions within the five-second period? Thank you very much. Thank you. Okay, Mr. Fetterman, back to you. Thank you, members of the panel. To correct some statements by defense counsel, they never filed a cross appeal. There is no issue before this court other than this district court, Judge Harmon found there to be misrepresentations. It is not now before this court to hear for the second time the same excuses the defendants made at the district court level. Now, if we go and look at the complaint, paragraph 103 and 104, the statements by that confidential witness, which defense counsel pointed out to you, are false, and they were known to be false. I mean, the statements by a defendant were known to be false at the time. They talk about a kick in a well. Anyone who knows anything about the oil business knows there are a lot of reasons for why a well can have a kick down hole. This well had mechanical problems. That causes a kick. When the drill bit jars down hole, it kicks out. So saying the well had a kick, it's really a meaningless statement. It doesn't mean you found incredible gas reserves that are coming back up the hole. But that's not the point here. The point is if you look at the representations by these defendants, the series of them, starting with November 9, 2009, and the following ones, the 8K signed by Jacobs. And, by the way, Jacobs is the CPA who worked for Deloitte as well as investment banks in an accounting position his entire career. And they try to disqualify saying, well, these disclosures are not under the SEC rules. They don't say these disclosures are not under the industry rules either. They leave it out there as if these are true statements. And the true statement is there are strong shows of hydrocarbon. You could drill a well in the Gulf Coast, in the unconsolidated sands, and you will have hydrocarbon shows, unquestionably. You go drill in the Piney Woods in East Texas, you will have shows. Osage County, Oklahoma, southern Kansas, you will have shows of oil. You will never have commercially producing wells because it is known those areas are depleted, they're getting too much water. They are not good wells. The impression being left here, strong shows of hydrocarbons, without a qualification for what that means, is severely reckless within the industry by knowledgeable people, or it's known to be fraudulent at the time. This panel, in its de novo review, can find, as the district court did, that these are misrepresentations because these people have 30-plus years' experience in the industry. They know the industry's standards. You keep going down, a very significant show of hydrocarbon gas with some oil. That was Terwilliger, October 13, 2011. There never was a very significant show of hydrocarbon gas. Never, never occurred. And that's the truth because this panel looks at the CWs. That's what they say. And there's no contesting otherwise. And remember, when they say there was a strong showing and an inflow of hydrocarbons, there's never an inflow of hydrocarbons because this well was never completed. They're playing fast and loose with industry terms being applied to lay people. It's not a level playing field at this point. Add a motion to dismiss. As far as fully aligned with the shareholders, Terwilliger received his stock at way below market price. So don't be fooled that he allowed his stock to trail down. He had no choice. He had it all margined. For him to get out of margin, he would either sell at a loss or have to replace it with another asset. Look at Terwilliger's background as disclosed in the complaint. This man had multiple bankruptcies with other companies in his past. He didn't have the assets to replace it with. He wasn't writing it down. He bought his stock and got his stock at pennies on the dollar. So that's not a true statement. He is not fully aligned with the shareholders. The rest of these disclosures are mere boilerplate. If they wanted the people to know the truth, they could have said that we are using terms that are not accepted or determined under the known industry standards. And these are known. The International Geological Society, everyone has adopted. So people know what you're talking about. That's why they have standards for definitions. This company chose to deviate from it, and they knew they were deviating from it. Maybe it was sloppy work by their counsel or not. It's either severely reckless or known to be false at the time when made. So for the conclusion here, if I might, look at the defendant's backgrounds, what they knew, who they are. Look at the confidential witnesses. Okay, defense position is now there after the fact. But they have the log analysis. They have the technical scientific data on which they provided us with their statement that the misrepresentations at the time were made were misleading and false. They had that technical data in hand, and it's in the complaint. We urge this court to remand this case for further proceedings to the district court and allow us to proceed to prove our case. Permit the investigation. I want my time to respond to counsel's argument about loss causation. Should I respond to it? Counsel is simply wrong. Loss causation is under Rule 8. It's not under 9B. No, no, no. But what was the corrective statement that you rely on? For the last statement at the end of the case? And I may be misunderstanding you. I understood you were relying on the corrective statement as being that the well had been abandoned and, number two, that the SEC investigation had been announced. Well, the statement by the SEC is not simply we are investigating, period. The statement by the SEC is we are investigating the prior specific statements made by these defendants. That was the SEC. It's not their typical statement of we've commenced an investigation and the SEC has asked and well's notices have been submitted. So the SEC investigation, we all know from Bernie Ebers and everyone else, they take forever. The SEC statement was not investigating. It was an investigation of specific particular statements by this company. And it does turn out from our confidential witnesses and our allegations that the statements made by the company, which are now being investigated, were false, they were not true, and they were known to be not true at the time made. And that part the district court got right. But what about the abandonment of the well? Do you rely on that also? Not as much as the other ones. Very good. Thank you very much.  Thank you, gentlemen.